**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-CR-20345-MOORE/MCALILEY**

**UNITED STATES OF AMERICA,**

**vs.**

**JEFFREY JASON COOPER,**
        **a/k/a "Dr. Janardana Dasa,"**
        **a/k/a "Janardana,"**
        **a/k/a "Jay,"**

        **Defendant.**
_____/

## GOVERNMENT'S TRIAL BRIEF

The United States hereby respectfully submits this Trial Brief to provide the Court with an overview of some of the evidence that the government expects to present in this case. In addition, this Trial Brief raises certain evidentiary and legal issues for the Court's consideration in advance of trial. First, several statements contained in recorded calls or in Facebook messages with the defendant are admissible to either provide context for the defendant's admissions, and as a statement of the declarant's then-existing state of mind under Fed. R. Evid. 803(3). Second, evidence that the defendant operated an unlawful business enterprise involving prostitution both before and after the dates contained in Count 4 of the Indictment is admissible to show the continuous nature of the defendant's unlawful enterprise. Finally, the government intends to impeach the defendant with a previous federal and state conviction, should he elect to testify in his own defense at trial.

1

## BACKGROUND

On May 4, 2016, the government charged the defendant by complaint with sex trafficking via fraud, in violation of 18 U.S.C. §§ 1591(a)(1) & (b)(1), and wire fraud, in violation of 18 U.S.C. § 1343.  See DE 3.  The government arrested the defendant later that day, and he made his initial appearance on May 5, 2016.  See DE 8.  On May 10, 2016, a federal grand jury returned an indictment charging the defendant with: 1) three counts of wire fraud, in violation of 18 U.S.C. § 1343; 2) the use of a facility in interstate or foreign commerce to promote an unlawful activity, and the performance thereafter of an act to promote the unlawful activity, in violation of 18 U.S.C. § 1952(a)(3)(A); 3) importation, and attempted importation, of aliens for prostitution or other immoral purposes, in violation of 8 U.S.C. § 1328; and 4) two counts of sex trafficking via fraud, and three counts of attempted sex trafficking via fraud, each in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(1).  See DE 12.

The indictment generally alleged that the defendant fraudulently recruited participants in the U.S. Department of State's Summer Work Travel ("SWT") program to come to the United States, where the defendant intended for the participants to perform commercial sex acts for his financial benefit.  The SWT program provides foreign college and university students with the opportunity to live and work in the United States during their summer vacations.  Foreign students who participate in the SWT program receive a J-1 visa authorizing them to temporarily enter, live, and work in the United States.  The indictment also alleged that the defendant used facilities of interstate commerce to promote and manage his unlawful prostitution business enterprise, which existed for a number of years both before and after he fraudulently recruited SWT participants in the summer of 2011.

2

In the summer of 2011, Victim 1 was a 21-year-old university student, who had grown up in a Muslim family in Kazakhstan.  Victim 1 previously traveled to the United States through the SWT program in the summer of 2010, had a positive experience working as a restaurant hostess, and wanted to participate in the SWT program again in the summer of 2011.  Victim 2 was also a 21-year-old university student in the summer of 2011, and had also grown up in a Muslim family in Kazakhstan.  Victim 2 heard about the SWT program, and decided to participate in it with Victim 1, whom she knew from her university.

Victim 1 knew Witness 1 because they had grown up together in the same town in Kazakhstan.  In 2011, Witness 1 worked at a travel agency in Kazakhstan that matched prospective SWT participants with host employers in the United States.  Witness 1 had also previously participated in the SWT program during the summer of 2010.  Witness 1 met the defendant during a chance encounter while she was visiting Miami prior to her return to Kazakhstan.  While Witness 1 was at a café with a friend, the defendant approached her, and a conversation ensued in which the defendant told Witness 1 and her friend that he operated a yoga and wellness center.  The defendant subsequently contacted Witness 1 through Facebook after she returned to Kazakhstan.  Witness 1 subsequently informed the defendant she worked at a travel agency matching SWT participants with U.S. employers.  The defendant suggested that Witness 1 send him secretaries and clerks to answer phones and make appointments at his yoga health centers.

Witness 1 referred multiple female students to the defendant to work for him under the SWT program, including Victim 1 and Victim 2.  Victim 1 and Victim 2 ultimately signed job contracts to work as receptionists for the defendant's yoga and wellness company.  The job

contract promised pay at $12 per hour, and stated that Victim 1 and Victim 2 would perform clerical duties for the company, such as answering phones and scheduling appointments.

Victim 1 and Victim 2 arrived in Miami on or about May 30, 2011.  Upon arrival, Victim 1 and Victim 2 asked the defendant about the receptionist job they had agreed to perform in their job contract.  At this time, the defendant revealed for the first time to Victim 1 and Victim 2 that their job involved providing "sensual" or "erotic" massages, which meant they were expected to manually masturbate clients to orgasm.  Victim 1 and Victim 2 told the defendant they were unwilling to perform any kind of massages on men, as that had not been represented to be part of their job duties working for the defendant, and would moreover be contrary to their religious beliefs.  Victim 1 and Victim 2 began looking for other employment, searching unsuccessfully for about a week.  Witness 1 did not know that the defendant expected Victim 1 and Victim 2 to perform sensual massages on men; otherwise, she would not have referred anybody to work for the defendant to begin with.  Neither Victim 1 nor Victim 2 wanted to perform sensual massages for the defendant, but they both eventually ran out of money and felt they had nowhere else to go.  Thus, Victim 1 and Victim 2 eventually began performing sensual massages for the defendant's financial benefit.

Victim 1 once told the defendant that she intended to report his illicit business activities to the police.  The defendant told Victim 1 that he had many friends in the police department who already knew about his business.  Victim 1 did not know whether the defendant was telling the truth or not because she was unfamiliar with police practices in the United States.  In turn, the defendant threatened to tell the victims' families and friends that the victims had performed sensual massages.  This terrified Victim 1 and Victim 2, as they were ashamed of having performed the sensual massages.  The defendant also told Victim 1 and Victim 2 that he had

many contacts in Kazakhstan through his Hare Krishna faith, and the victims believed that the defendant could contact these individuals to inform them of the massages that Victim 1 and Victim 2 performed.  Victim 1 and Victim 2 did not want anybody in Kazakhstan finding out about the massages they performed given the shame they felt for performing them.

## DISCUSSION

I.    **Several Statements made during Recorded Calls or Contained in Facebook Messages with the Defendant are Admissible to Provide Context for the Defendant's Statements, and to Show the Declarant's Then-Existing State of Mind**

1.    **Relevant Facts**

The defendant exchanged several messages via Facebook with Victim 1, Victim 2, and Witness 1.  These exchanges occurred both before, during, and after Victim 1 and Victim 2 worked for him.  For example, the defendant exchanged the following relevant messages, among others, with Witness 1:

> . . .

> [Defendant, September 27, 2010]:  Never heard back from you? Give me a call if you are still in America. My number is:  786 859-6115. kiss kiss Dr. Jay

> . . .

> [Witness 1, May 5, 2011]:  Ok) I am very good, thank you. I am studying and working as Work and Travel coordinator. I send students to America

> . . .

> [Defendant, May 5, 2011]:  Wow! that's great. Maybe you can send me some pretty girls that want to work with my yoga health centers? I always need new workers. They will make good money, paid cash everyday they work. Let me know. You will make money as well for recommending them :)

> . . .

[Witness 1, May 5, 2011]:  I am attaching blank job offer form and the resumes of four excellent girls.. Could you complete the job offer for them as soon as possible, if you can today please. They have difficult situation, they have already gave the job offer from some employer, but that offer wasn't submitted by CCI (the sponsor of our program), because it was fake job offer. These students will be very grateful to you for this job offer. Because if they don't give another real job offer to our agency tomorrow, they will cancel a treaty and these students will not go to America and the agency will not return all paid money to them. Could you help them please, just complete this job offer for them and comfirm that you will hire them, when the manager from CCI will call you. I know that you are very kind person and you like to help people. You have big heart. And these girls will be the best workers for you, I promise. You will be glad to have such workers ;) Help them please and they will help you, when they come to miami. I will be looking forward to your reply.

. . .

[Defendant, May 9, 2011]:  . . . how do complete the application on facebook? Not very computer savy, maybe you can walk me through it? Thanks :). Or just have the agency call me, i know what to say. No worries :)

[Witness 1, May 9, 2011]:  Ok, I will say you what information I need and I will fill it uo by myself. I need company info (adress, number, fax) Job description (salary, hours to work, number of days, pay frequency, avertime aviability and info about uniform), the information about housing (is housing provided? if yes, the info about costs and address) if no, could you suggest some housing for them.

. . .

[Defendant, May 9, 2011]:  Janardana's Yoga and Wellness, S.A. , 7904 West Drive, unit 203, North Bay Village, Fl. 33141 . Phone: 786 859-6115, Fax: 305 531-1070. Job description: performing clerical duties for the company, setting up appointments, answering phone calls, etc…hours: 8 hours a day, 6 days a week, $12 dollars per hour paid weekly. Possible overtime on certain days. Dress is casual, no uniform required. Housing is available in the same building, each lady will pay $70 dollars weekly to cover their lodging expense.

. . .

6

[Witness 1, May 9, 2011]:  I looked at your web site. It is very nice! I like Yoga very much. I am going to yoga courses soon

. . .

[Defendant, May 18, 2011]:  Hey, sweety :). I spoke to the approval company here in U.S.A., very nice people.  They approved your friends :) yea! Wonderful! Good news. Looking forward to meeting them and seeing you again ;). Do you have any other girls that want to come as well? Let me know? I'm friendly with 2 of the ladies at [Company A] now. If you know some other girls, submit the application to that agency ; it's easier to get them approved. kiss kiss :)

. . .

[Witness 1, May 19, 2011]:  I have two girls, they are looking for job offers too. They are asian. Do you want me to send their photoes?

[Defendant, May 19, 2011]:  Great! . . . Send me their photos, sure that sounds great! But, have them contact that same agency, they know me now and are friendly with me

. . .

[Witness 1, May 19, 2011]:  I have a question, will they all work as a receptionists?

[Defendant, May 19, 2011]:  Yes, mostly. Clerical work, computer work, setting up of appointments Sending out of emails to clients Send their resume and photo to my email, the one you have. paseba :)

[Witness 1, May 19, 2011]:  Ok) One of them [Victim 1] (with me in the pic) is my good friend. And [Victim 2] is her friend.

. . .

[Defendant, May 19, 2011]:  paseba, prikrasni :) They are beautiful, look forward to working with them ;)

. . .

[Witness 1, May 20, 2011]:  Hi!! I have said them about you. And I gave them your phone number. [Victim 1] and [Victim 2] will call you, they'd like to talk to you. I am attaching their resumes.

. . .

[Defendant, June 2, 2011]: [Witness 1], these first 2 girls you sent are not easy? Alot of problems with[Victim 1], not so great to work with and [Victim 2] doesn't speak any English "really"? But, she is at least a nice girl. Very humble and easy to deal with. I hope the other 4 girls coming are not going to be like this? We provide sensual massages to wealthy clients and the girls can make alot of money with not much effort. But, they need to cooperate and not be difficult. I have many beautiful ladies in Miami and L.A. that will love to wiork with us, so i don't need the extra aggravation? I only sponsored these ladies, so we all can make money and have a nice summer. But, if it's not going to work smoothly; then they should go elsewhere. . . .

[Witness 1, June 2, 2011]:  Hello. It was a surprise for everybody, I mean sensual massage, why you didn't say me earlier about it? . . .

[Defendant, June 2, 2011]:  I did mention it to you? Maybe you didn't understand? Check back on the chats we had on facebook, over a month ago. I said, i could use pretty girls to help with my yoga and wellness company, and that we offer massages to wealthy clients and they would make money. You also, assured me that if i sponsored the first 4 ladies,i would have no problems with them? You're exact words were ( if i help them, they would help me ;) ;) ) You don't remember that, sweety? I also mentioned aspects of my business when i met you in Miami last Sept.; and asked if you would like to join in, but you said you were on vacation already and didn't want to work anymore, but liked the concept. Think back, dear? Believe me, it was mentioned. No worries, they are getting the hang of it little by little. The other girls that work with us are showing them that it is not a big deal and it's a great way in this country to make good money in many cities.

. . .

[Defendant, June 9, 2011]:  Work it out [Witness 1]. Not cool? I helped you, and did my part and you promised me I would have no problems? Call them and fix it, thank you. Let them understand, we can figure out something for them to do. But, contacting

8

[Company A], was not good. It was unnecessary. Thanks, [Witness 1] :) Jay

. . .

[Defendant, June 10, 2011]: Thank you, [Witness 1]. I appreciate it. :) Just tell them everything will be okay, and just relax. The other two girls (workers) [Victim 1] and [Victim 2] are happy. They will have fun working with us, thanks :). Do you have a number for them in U.S. ? I'll give them a call.

. . .

[Witness 1, August 1, 2011]: Hi! How are you doing? How are your workers [Victim 1] and [Victim 2]? Are they good?

[Defendant, August 4, 2011]: Hey, darling! Kak dela? Yes, everything is going fine. They are very nice girls. You should send me more, the other 3 ladies never arrived?

. . .

[Defendant, August 6, 2011]: Bad news, today. Your 2 friends took off, without warning and stole money, one of my cell , my keys and never paid for a damaged item in the apt they were staying in. You should get a hold of them and tell them if i don't get back my keys, phone, and the money they owe me; i will go to the police as well as the agency. I am not playing! . . .

. . .

[Defendant, September 6, 2011]: Well, not really. Your girlfriend [Victim 1], still has our work phone and key fob and is reluctant to give it back? Why, i don't know? These were diffinately strange girls, not "my cup of tea" at all. Very weird and unpredictable. She contacted me and my secretary last week and promised to meet my secretary Jessica to drop off the items, but never followed through with the meeting that she arranged with her? This is the type of things we are talking about? That work phone has alot of numbers of our very good, personal clients. She is affecting our business! I will see to it that she or [Victim 2] never get visas again for this country. I have friends in high places, she's playing with the wrong person. I was nothing but nice to her and [Victim 2], i didn't deserve this silliness and wll not tolerate it. They also owe me and my wife Indu money, but that's not so important. The phone and key fob are! I have her banking information and can make things

9

difficult for her, i only want back my property. Talk to her, before things get worst. I'm giving her 2 days to return said items, then i will do what i need to do! Thank you.

[Defendant, April 20, 2012]:  Hey, there :). Long time, how are things? Are you coming back to The States in the near future?

[Defendant, May 2, 2012]:  [Witness 1], you're not friendly with me anymore? I never heard a response? How areyou?

The defendant also exchanged the following messages with Victim 1:

[Victim 1, May 21, 2011]:  Hello!  How are you?  My name is [Victim 1].  I am going to USA this summer by Work and Travel Program.  [Witness 1] told me about you and your organization, I liked it and I would like work with you.  I will come to New York at 1th of June and then I will go to Florida.  See you.  Have a good time, thank you.

[Defendant, May 22, 2011]:  Hey! Kak dila? Sure, darling.  Look forward to meeting you.

[Defendant, May 28, 2011]:  Hi, sweety :). Kak dila? When are you girls actually arriving in Miami? What date?  Paseba

[Victim 1, May 29, 2011]:  Hi:) I will come with my friend in 31 of May at 12.05 p.m. ne za chto!:)

[Defendant, May 29, 2011]:   ;) ;) see you both very soon, prikrasni :)

[Defendant, August 6, 2011]:  If i don't get back my phone, keys and the money you owe me for the tickets and massage [Victim 2] did yesterday, as well as the broken mirror in unit 104. I'm going to the police as well as notifying [Company A]. This is not a joke! what you did is unacceptable!

[Defendant, August 14, 2011]:  When will you return my keys, and phone? Call Jessy to meet up with her to return them. Thank you. You also owe me for a least one massage that [Victim 2] did and for the broken mirror. Give everything to Jessy.

[Victim 1, August 22, 2011]:  We do not have any money. What do you want us to do?

10

[Defendant, August 28, 2011]:  Then you should start working again? Muslims always forgive and forget. We can move behind what happened? but i never got the phone or the fob for the lobby door back ? The fob costs $100 dollars, i don't want to have to pay for it. It's the landlord's property, not mine. Thank you. Just come back to work, business is picking up here now. You don't have to go to Cali, don't worry. I have people there now. HARE KRSNA!!! Thanks for responding. Salaam A Lakum!!!

[Defendant, August 30, 2011]:  Can you return the fobs, please. The other fob that was in unit 203 is missing also? You were the only one that had access to 203 and knew where it was? Please, return them. Thank you. They are not my property, they are the property of the landlords!

[Defendant, August 31, 2011]:  I will come by that gym tomorrow, and make a "ruckus" until i get back both of my fobs. I only gave you one to use, and now both are gone? I want them both back immediately!!!!!!!! Not playing around.

[Defendant, September 12, 2011]:  I heard about everything, involving you and [Victim 2] ( and i mean everything). We all know (Indu, Jessy, Vicky, Wayne), KRSNA has a way of revealing everything in due course of time. That's why it's always best to be honest and not live something you are not. It just so happens that guy Julio in the Normandy Gym is a good friend of Indu's daughter and knows Indu for at least 9 months now, (ha ha) funny hah, the one guy that you gals happened to have fun with knows us all? So, you shouldn't lie. You both are not "virgins" , at least not anymore. I wonder what your father would think if he found out? Just be honest, you didn't need to lie to us all . HARE KRSNA!!!

[Defendant, September 12, 2011]:  We all know everything, you should've just been honest with us. You see how everything comes out? Salaam A Lakum

[Defendant, September 12, 2011]:  We know Julio that you met in Normandy gym, he was going out with Indu's daughter. You girls should've picked someone else. Karma! HARE KRSNA!!!

Finally, the defendant had the following exchanges with Victim 2:

[Defendant, May 28, 2011]:  Hi. how are you? Look forward to meeting and working with you :). When are you planning on arriving in Miami, dear?

11

[Victim 2, May 28, 2011]:  Hi!we are fine! And you?kak dela?we will come at 31 of may at 12.30 p.m. We are look forward to meeting with you too!:)

[Defendant, May 28, 2011]:  Great! ;) . Things are Great! Thanks for asking :). But, that's Nyc; when do you arrive in Miami area? What day? How many days are you going to stay in Nyc, dear?

[Victim 2, May 28, 2011]:  We will be in NYC in 31 of May,and we took tickets to Miami in 31 of May,so we will be in Miami in 31 of May at 12.30 p.m. See you soon:)

[Defendant, May 29, 2011]:  Ok :), send flight no, and Airline ; so i can pick you up.

[Victim 2, May 29, 2011]:  US Airways MIAMI INTL arrival time 12:05 p.m

[Defendant, May 29, 2011]:  Great! got it :)

[Defendant, January 1, 2013]:  Salaam A Lakum, muslima :). Kak dela?

[Victim 2, January 4, 2013]:  aleukum asalam!!!horowo...and you?

[Defendant, January 6, 2013]:  Good good, darling ;). You should come back to Miami and visit me. I am single now. Always liked you, muslima :). Come back for vacation

[Victim 2, January 6, 2013]:  i will never back to you!!!

[Defendant, January 6, 2013]:   Ha ha ha, just joking. Salaam A Lakum, muslima

[Victim 2, January 7, 2013]:  aleukum asalam!how is your work?

[Defendant, January 8, 2013]:  Great! :). Expanding to many cities. Having fun ;). What are you doing? How's [Victim 1]?

[Victim 2, January 9, 2013]:   your work is not good....I work, teaching dance at several places, and I work in insurance...[Victim 1] is good, looking for work. how is your hare khrishna?)))

[Defendant, January 10, 2013]:  Everything is good, dear. ALLAH says to not critize others! Look at the faults in yourself, first. Try to correct those. I heard about your "fun" with that guy Jorge from

12

the gym. He's a friend of Indu's daughter. Small Beach, Miami Beach. So, you and [Victim 1] lied about being "virgins". You didn't have to lie? Be yourself. Don't try to play a role you are not? Keep dancing, if you enjoy it. HARE KRSNA!!! Salaam A Lakum.

[Victim 2, January 10, 2013]:  Yes Allah says so...i'm not critized you, but i'm so intrested about what says your God KRSNA?It allows you to do with things?I'M always trying to corect myself......Jorhe is good gyu...i just kiss with him no sex never...i'm virgin...I need not tell lies',,,I am pure before God Unless otherwise of what I was doing in Miami is killing me still every day, and especially when I go to the mosque I was there crying...Hare Krsna

[Defendant, January 10, 2013]:  Then, why were you and [Victim 1] going to different clubs 5 times a week in Miami? Partying with different men? What we were doing was business, dear. To earn income! There is a big difference. What you were doing, was purely for your own sense gratification. Not work related. Btw, Jorge said you and him had sex several times. Not just kissing, dear. It's all good. I'm just saying; don't lie.

[Victim 2, January 10, 2013]:  badly, as he could speak at all ... we just kissed him and walked once to the club and saw only gym I dont have sex with Jorge,but he wanted i know I do not have more sex because it is impossible to us b i'm muslim don't foget, he telling lie like a teenager ... about the clubs ... so we used to go to clubs because in the first in our country such was not in the Secondly, we went to do this dirty job I hated this job...so we went with different guys because when you go to the same they want sex, they do not understand us and we do not believe that a virgin,,,

[Defendant, January 12, 2013]:  I heard about your "fun" with that guy Jorge from the gym. He's a friend of Indu's daughter. Small Beach, Miami Beach.he said

[Victim 2, January 12, 2013]:  its not true....

In addition to these Facebook exchanges, the government recorded multiple telephone calls between the defendant and several others, including Victim 1.  The government intends to admit these Facebook messages and recorded calls (along with their transcripts) into evidence during the defendant's upcoming trial.

13

2.      **Introduction of the Facebook Messages and Recorded Calls are Proper because They Consist Solely of the Defendant's Statements and Statements that do not Qualify as Hearsay**

A statement is not "hearsay" if it is offered against a party and is the party's own statement.  Fed. R. Evid. 801(d)(2)(A).  The government need only show that the defendant had made the statements by a preponderance of the evidence in order for the statements to be admissible under Fed. R. Evid. 801(d)(2)(A).  See, e.g., United States v. Lang, 364 F.3d 1210, 1222 (10th Cir. 2004).  In addition, "[i]t is well-settled that statements that are offered for context, and not for the truth of the matter asserted, are not hearsay as defined in Rule 801 of the Federal Rules of Evidence."  United States v. Macari, 453 F.3d 926, 941 (7th Cir. 2006).

In this case, the government will link the Facebook messages and recorded calls to the defendant via several means, including the fact that the defendant admitted to law enforcement that the Facebook account in question belonged to him.  See United States v. Barnes, 803 F.3d 209, 217 (5th Cir. 2015) (finding the defendant's Facebook messages properly authenticated because a witness testified that she had seen the defendant using Facebook, recognized his Facebook account, and recognized the defendant's style of communication).  The defendant listed his telephone number multiple times in his Facebook account, and this was the number used by the defendant during multiple recorded telephone calls.  The defendant also listed this same telephone number in numerous advertisements seeking sex workers,[1] and he also provided this number as part of his participation as a host employer under the SWT program.  Finally, the content of the recorded calls and Facebook messages, which reveal familiarity with facts and circumstances that would have been known only to the defendant, tend strongly to show that the Facebook messages and statements made during the recorded calls were uttered by the

---

[1] The Government intends to offer several of these advertisements into evidence at trial as well.

14

defendant.  See United States v. Browne, __ F.3d __,  2016 WL 4473226 (3d Cir. Aug. 25, 2016) (finding the defendant's Facebook messages properly authenticated, in part, because the victims' trial testimony was consistent with the content contained in the Facebook chats).  As such, the statements attributed to the defendant in the Facebook messages and recorded calls are properly admissible under Fed. R. Evid. 801(d)(2)(A).   Id. (observing that the defendant's Facebook messages "were properly admitted as admissions by a party opponent under Rule 801(d)(2)(A)").

The statements of Witness 1, Victim 1, Victim 2, and the other individuals on the recorded calls are admissible in order to provide the context necessary to make the defendant's statements in the course of the message exchanges and conversations intelligible.  If the jury is not permitted to consider the other side of a message exchange or conversation, the defendant's responses and comments in these exchanges would be nonsensical and meaningless.  Thus, the other statements and messages are necessary, not to prove the truth of the matter asserted, but to provide proper context for the defendant's admissions.  See id (recognizing that the other statements made by the victims to the defendant via Facebook were not hearsay because the put the defendant's statements "into perspective and ma[d]e them intelligible to the jury and recognizable as admissions") (citations omitted); United States v. Bermea-Boone, 563 F.3d 621, 626 (7th Cir. 2009) (finding that the admission of recorded calls "were not offered for their truth, but to provide context for Bermea-Boone's admissions concerning the drug conspiracy and to make those admissions intelligible for the jury"); United States v. Schalk, 515 F.3d 768, 775 (7th Cir. 2008) (recognizing government informant's statements on recorded call with defendant admissible because it provides context for the defendant's admissions); United States v. Dupre, 462 F.3d 131, 137 (2d Cir. 2006) (finding that emails were not offered to prove the truth of the matters asserted, but rather they provided context for the defendants' messages sent in response);

15

Macari, 453 F.3d at 941 (observing that without the other statements, the defendant's admissions "would not have made any sense").

### 3. Some Portions of the Facebook Messages and Recorded Calls are Also Admissible under Fed. R. Evid. 803(3)

Fed. R. Evid. 803(3) provides that a statement is not hearsay if the statement is one "of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will."  "Offering evidence under the state of mind **exception** to the hearsay rule is different than offering it for a non-hearsay purpose." Smith v. Duncan, 411 F.3d 340, 346 n.4 (2d Cir. 2005) (emphasis in original).  "The **exception** to the hearsay rule is invoked when the statement is offered for the truth of the matter asserted **and** shows the declarant's state of mind." Id. (citation omitted and emphasis in original).  "A key circumstantial guarantee of trustworthiness in respect to Rule 803(3) is that it requires that the statement be contemporaneous with the declarant's 'then existing' state of mind, emotion, sensation, or physical condition." United States v. Naiden, 424 F.3d 718, 722 (8th Cir. 2005). Admissibility under Fed. R. Evid. 803(3) is therefore determined by three factors: contemporaneousness, chance for reflection, and relevance. United States v. Ponticelli, 622 F.2d 985, 991 (9th Cir. 1980).

Several portions of the defendant's Facebook exchanges with Witness 1, Victim 1, and Victim 2 are admissible as declarations of the declarant's then-existing state of mind under Fed. R. Evid. 803(3).[2]  Such portions include the following:

---

[2] In addition to the defendants' Facebook exchanges with Witness 1, Victim 1 and Victim 2, the government intends to introduce into evidence other statements made by Victim 1 and Victim 2 to other government witnesses who will

- Witness 1's Facebook messages on May 5, 2011, that she was working as a SWT coordinator and that she knew of four students who needed work, and who would be happy to work for the defendant;

- Witness 1's Facebook messages on May 9, 2011, asking the defendant for the details of the job offers for the four students, along with her statements that she likes yoga and is looking forward to meeting the defendant in Miami during September;

- Witness 1's Facebook messages on May 19, 2011, to ask if two Asian girls could receive job offers to work for the defendant as receptionists, along with the fact that Victim 1 is a friend of Witness 1 and that Victim 2 is a friend of Victim 1;

- Witness 1's Facebook message on June 2, 2011, to express surprise at finding out that the defendant expected Victim 1 and Victim 2 to perform sensual massages, and confronting the defendant with the fact that he had not told her about the massages beforehand;

- Victim 1's Facebook message on May 21, 2011, that she wants to work for the defendant and will be traveling to Florida soon to do so;

- Victim 1's Facebook message on May 29, 2011, that she will be arriving in Miami, along with her friend, on May 31, 2011;

- Victim 1's Facebook message on August 22, 2011, that she does not have any money and her question to the defendant of what should she do about the fact she has no money;

- Victim 2's Facebook message on May 28, 2011, that she will be arriving in Miami on May 31, 2011 abroad a U.S. Airways flight;

- Victim 2's Facebook message on January 6, 2013, that she would never come back to visit the defendant;

- Victim 2's Facebook message on January 9, 2013, that she works teaching dance at several locations and also works in the insurance industry while the defendant's work is not good; and

---

testify at trial, which statements are admissible pursuant to other provisions of Rules 803 and 804.  The government respectfully suggests that objections to the admission of those statements, if any, may be addressed at trial, if and when the objections are lodged..

- Victim 2's Facebook message on January 10, 2013, that what she did in Miami is still killing her daily, especially when she goes to the mosque to attend religious services.

During a recorded call, Victim 1 also confronted the defendant and stated that she did not know the job entailed "sexual massage with happy end[ing]." If Victim 1 had known about the true nature of the employment beforehand, she would not have come to work for the defendant. Victim 1 also stated during the call that the defendant's job was not good because she is Muslim.

To begin with, the passages discussing the future travel plans of Witness 1, Victim 1, and Victim 2 are admissible under the then-existing state of mind exception because they reflected an intent to travel from Kazakhstan to Miami. See United States v. Barraza, 576 F.3d 798, 805 (8th Cir. 2009) (finding statements of one's intention to travel to Mexico admissible under Fed. R. Evid. 803(3)); United States v. Natson, 469 F.Supp.2d 1243, 1249 (M.D.Ga. 2006) (admitting statements as then existing state of mind and plan since they involved plans for the declarant and the defendant to get gas before driving to Columbus); United States v. Smallwood, 299 F.Supp.2d 578, 585 (E.D.Va. 2004) (admitting statements under Fed. R. Evid. 803(3) to show that the victim intended to meet with the defendants on the day of his murder and that he in fact did so). This would also apply to Victim 2's statement that she intended to never come back to Miami to visit the defendant. All of these statements reflect the declarants' statement of mind – specifically, the declarant's contemporaneous intent to travel or not travel in the near future – and are admissible in accordance with Fed. R. Evid. 803(3).

Next, Witness 1's prospective statements to the defendant regarding the work the defendant had for her friends and others are admissible to show a then existing plan. "Hearsay statements reflecting a declarant's intentions or future plans are admissible against the declarant to prove subsequent acts under Fed. R. Evid. 803(3)." United States v. Nersesian, 824 F.2d

1294, 1325 (2d Cir. 1987) (citations omitted).  "More importantly, declarations of intention or future plans are admissible against a nondeclarant when they are linked with independent evidence that corroborates the declaration." Id. (citation omitted).  In this case, the evidence will show that Victim 1 and Victim 2 did travel from Kazakhstan to Miami on May 30, 2011, to work for the defendant.  Thus, the future plans Witness 1 made with the defendant prior to May 30, 2011, are admissible under Fed. R. Evid. 803(3) to show a plan that was later put into action.  See also United States v. MacInnes, 23 F.Supp.3d 536, 542 (E.D. Pa. 2014) (finding statements properly admitted under Fed. R. Evid. 803(3) because they showed that the declarant acted in accord with a plan).  The declarations at issue collectively indicate that Victim 1 and Victim 2, along with others, intended to enter the United States during the summer of 2011 to serve as receptionists at the defendant's yoga studio.  Since these statements reflected an upcoming future intention or plan for the victims to work for the defendant in a clerical capacity later that summer in 2011, they are properly admissible under Fed. R. Evid. 803(3).

Finally, the remaining statements are admissible because they reflect an emotional or mental condition at the time the statements were made.  Some of the statements reflected a current status (i.e., awareness of the contents of the defendant's website, interest in yoga, lack of money, etc.) while others reflect a current state of being (i.e., friendship with Victim 1 and between Victim 1 and Victim 2, employment as a travel coordinator, or work teaching dance or in the insurance industry).  The remaining statements either show an emotional feeling, such as shock (i.e., surprise that the defendant expected SWT employees to perform erotic massages) or mental anguish (i.e., the pain suffered by Victim 2 as a result of her exploitation by the defendant).  These statements were all contemporaneously made with the declarants having little chance for reflection, mainly because they were uttered in response to the defendant's

19

statements.  See United States v. Partyka, 561 F.2d 118, 125 (8th Cir. 1977) (finding statements manifestations of a present state of mind since they were an immediate reaction to a proposal). The contemporaneous nature of the statements guarantees their truthworthiness, and admissibility pursuant to Fed. R. Evid. 803(3).

The statements are also highly relevant to several issues in the case.  For example, Witness 1's declaration that she viewed the defendant's website and liked yoga supports the inference that she did not know the defendant's true intent (i.e., that he used a sham yoga studio as a front to bring the victims into the United States for work in his prostitution enterprise). Witness 1's declaration of surprise after finding out that the defendant expected Victim 1 and Victim 2 to perform sensual massages further supports the inference that she did not know the defendant's true intent.  In addition, Witness 1's declaration that she is friends with Victim 1 makes it less likely that she intentionally set up her friend to work in the prostitution industry. Victim 2's declaration that she teaches dance and works in the insurance industry makes it less likely that she was a professional prostitute looking to enter the United States under fraudulent purposes to work in the commercial sex industry.  Finally, Victim 1's statement that she would not have worked for the defendant had she known the true nature of the employment and Victim 2's statement that what she did in Miami is "killing her" everyday support the inference that neither victim wanted to perform sensual massages for the defendant.  Since all of these statements were contemporaneously made with little chance for reflection, and are relevant to issues in the case, they are admissible under Fed. R. Evid. 803(3).

**4.    Statements Made to a Representative at Company A are also Admissible to Show State of Mind**

On June 7, 2011, Victim 3, Victim 4, and Victim 5 entered the United States, and were supposed to work for the defendant, just like Victim 1 and Victim 2.  On June 8, 2011, Victim

3's cousin called Company A and told a Company A representative that Victim 3, Victim 4, and Victim 5 were currently in Kissimmee, Florida. Victim 3's cousin stated that Victim 3, Victim 4, and Victim 5 did not want to work for Janardana's Yoga and Wellness as scheduled because some workers had already arrived and were told they had to perform massages instead of working as receptionists as stated on their job offers. These statements are admissible under Fed. R. Evid. 803(3) because they show the declarant's then-existing state of mind in that it reflects Victim 3's mental feeling of not wanting to work for the defendant, and a future plan to do something else other than traveling to Miami to work for the defendant.

This statement is also admissible for a non-hearsay purpose to show the effect on the listener. The Company A representative that fielded this phone call from the relative of Victim 3 will testify that he called the defendant after receiving this information to determine if his workers were indeed performing massages instead of working in a clerical capacity.

## II. Evidence of the Defendant's Continuous Operation of a Prostitution Enterprise Both Before and After the Dates Contained in Count 4 of the Indictment is Admissible to Prove that the Defendant Maintained and Operated an Unlawful Business Enterprise

In the pending indictment, the defendant is charged in a single count, Count 4, with violating Title 18, United States Code, Section 1952(a)(3)(A). Specifically, the defendant is charged with using a facility of interstate commerce to "promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity," and thereafter performing or attempting to perform an act that did "promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity." The indictment alleged that the unlawful activity that the defendant intended to promote was "a business enterprise involving prostitution in violation of Florida Statute § 796.07."

To establish the charged violation of Section 1952(a)(3)(A), the government must prove that the defendant intended to promote "a business enterprise involved in prostitution." See 11th Circuit Pattern Jury Instructions, Offense Instruction 71 (2010). Importantly, the term "business enterprise" is defined as **"a continuous course of conduct or series of transactions to make a profit, not a casual, sporadic, or isolated activity."** Id. (emphasis added); United States v. Corona, 885 F.3d 766, 771 (11th Cir. 1989). Thus, as to Count 4, the government will be required at trial to establish that the defendant's use of a facility of interstate commerce was intended to promote an ongoing, "continuous course of conduct." Indeed, the government will be required to prove that the business enterprise was an ongoing venture before and after the dates listed in Count 4. See, e.g., United States v. Bates, 840 F.2d 858, 863 (11th Cir. 1988) (reversing conviction under § 1952 where government failed to introduce evidence of "enterprise constituting a continuous course of drug trafficking" other than the specific conduct alleged to have promoted an unlawful activity); United States v. Corbin, 662 F.2d 1066, 1072 (4th Cir. 1981) (holding that in order to establish a "business enterprise," the government should have introduced evidence illustrating that before and after the conduct specifically alleged, the defendants were engaged in an "ongoing enterprise"); see also United States v. Gallo, 782 F.2d 1191, 1193-94 (4th Cir. 1986) (holding that extrinsic evidence of other unlawful conduct may be introduced for the purpose of proving the existence of the business enterprise).

To establish that the defendant violated Section 1952(a)(3)(A) as charged in Count 4, the government will therefore seek to introduce evidence relating to all aspects of the defendant's ongoing "business enterprise," including the following enterprise evidence that occurred after February 9, 2013:

- In a recorded call that occurred in June 2015, the defendant admitted that he still ran a prostitution enterprise and booked prostitution appointments for women in California,

Colorado, North and South Carolina, as well as Miami. In the same recorded call, the defendant admitted to maintaining advertisements to hire women to work for him in the commercial sex industry.

- Facebook messages exist between the defendant and a woman identified as S.D. between November 17 – December 10, 2015. In this Facebook exchange, the defendant and S.D. discussed specific sexual acts to be performed with the defendant's prostitution clients.

- Text messages between the defendant and multiple females occurred between October 2015 – March 2016 where the defendant arranged several prostitution dates for the women. The defendant also recruited women and explained via text message that escort work in South Florida entailed full-service sexual intercourse. The defendant promised other women that they would make at least $2,000 a day if they prostituted for him.

- At the time of his arrest in May 2016, the defendant possessed a notebook, which contained the names of multiple females and entries with their nationality, age, height, weight, hair color along with the length of it, breast size, the term "booty," and whether they had transportation or not;

In addition, the defendant posted multiple advertisements on www.backpage.com, an online classified advertisement website commonly used to solicit sexual services prior to the beginning date contained in Count 4 of the Indictment. In fact, the defendant posted advertisements on Backpage as far back as September 2009. In short, the government will seek to introduce all of this evidence in order to establish that the defendant intended to promote a business enterprise engaged in prostitution.

The government again notes that the text messages and Facebook exchanges referenced above do not constitute inadmissible "hearsay." "Hearsay" consists of out-of-court statements offered "to prove the truth of the matter asserted." Fed. R. Evid. 801(c)(2). Since the government is not offering the statements in the text messages or Facebook exchanges noted above for their truth, but merely context for the defendant's admissions, the statements are not considered "hearsay." See United States v. Brinson, 772 F.3d 1314, 1322 (10th Cir. 2014) (noting that statements made to an undercover officer regarding the location, price, and lack of

condom for a proposed sex act did not constitute "hearsay" because the statements were not offered for their truth); United States v. Monaco, 700 F.2d 577, 582 (10th Cir. 1983) (finding testimony describing conversations between officers posing as clients and prostitutes working in parlors, such as services the women would provide and the amount to be charged for their services, did not constitute hearsay because they were offered only to show that such conversations took place).

### III.   The Government Intends to Impeach the Defendant with Previous Federal and State Convictions should He Testify at Trial

#### 1.      Relevant Facts

On December 10, 1998, the defendant pleaded guilty in the Southern District of Florida to making a false statement in the application and use of a passport in violation of 18 U.S.C. § 1542.  See Case No. 98-CR-736-JLK.  In order to successfully plead guilty to making a false statement in the application and use of a passport, the defendant had to admit to the following elements:  1) the defendant made a false statement in an application for a United States passport; 2) the defendant made the statement intending to get a United States passport for his own use; and 3) the defendant acted knowingly and willfully.   See Eleventh Circuit Pattern Jury Instructions, Special Instruction No. 60 (2010).

On May 15, 2008, the defendant pleaded guilty to larceny grand theft in the 3rd degree in violation of Fla. Stat. §  812.014.  In order to successfully plead guilty to this offense, the defendant had to admit to the following elements:  1) the defendant knowingly and unlawfully obtained or used or endeavored to obtain or use the property of another; 2) the defendant did so with the intent to temporarily or permanently (a) deprive the victim of his or her right to the property or any benefit from the property, or (b) appropriate the property of the victim to his or

her own use or to the use of any person not entitled to it; and 3) the property was valued at $300 or more.  <u>See</u> Fla. Stat. §  812.014 (2007).  The maximum penalty for larceny grand theft in the 3rd degree is up to five years imprisonment.  <u>See</u> Fla. Stat. §  775.082 (2005).

### 2. **Fed. R. Evid. 609(b) Allows the Government to Attack the Defendant's Character for Truthfulness through Use of his 1998 Passport Fraud Conviction**

Fed. R. Evid. 609(b) prohibits the admission of evidence of prior criminal convictions for impeachment purposes if the convictions are more than ten years old, unless the court determines that the "probative value [of the conviction], supported by specific facts and circumstances, substantially outweighs its prejudicial effect."  While there is a presumption against the use of prior convictions over ten years old, exceptional circumstances exist in this case to warrant the admission of the defendant's prior 1998 conviction for making a false statement in the application and use of a passport should he testify.  <u>See</u> <u>United States v. Pritchard</u>, 973 F.2d 905, 908 (11th Cir. 1992) (noting that "there is a presumption against the use of prior crime impeachment evidence over ten years old; such conviction 'will be admitted very rarely and only in exceptional circumstances'") (citation omitted).

Several factors are relevant in deciding whether to admit evidence pursuant to Fed. R. Evid. 609(b):  "(1) [t]he impeachment value of the prior crime; (2) [t]he point in time of the conviction and the witness' subsequent history; (3) [t]he similarity between the past crime and the charged crime; (4) [t]he importance of the defendant's testimony; [and] (5) [t]he centrality of the credibility issue."  <u>Pritchard</u>, 973 F.2d at 909 (citing <u>United States v. Sloman</u>, 909 F.2d 176, 181 (6th Cir. 1990)).  "Another important factor to consider is the government's need for the impeaching evidence."  <u>Id</u>. (citing <u>United States v. Cathey</u>, 591 F. 2d 268, 276 (5th Cir. 1979)).

The defendant's 1998 conviction for making a false statement in the application and use of a passport is relevant, probative, and not unfairly prejudicial.   First, the prior conviction is relevant because the <u>mens</u> <u>rea</u> required for the defendant's prior conviction of passport fraud is similar to the <u>mens</u> <u>rea</u> required for the wire fraud and sex trafficking by fraud counts that he currently faces.   The defendant's passport fraud conviction required that he knowingly and intentionally made a false statement in an application for a passport.  Eleventh Circuit Pattern Jury Instructions, Special Instruction No. 60 (2010).  The wire fraud counts require the defendant to have acted with intent to defraud, and the sex trafficking by fraud counts require the defendant to have committed certain acts by means of fraud.   <u>See</u> Eleventh Circuit Pattern Jury Instructions, Offense Instruction No. 51; Eleventh Circuit Pattern Jury Instructions, Offense Instruction No. 63 (2010).   As such, the defendant's prior conviction for passport fraud is relevant since intentionally making a false statement involves a similar <u>mens</u> <u>rea</u> to intending to defraud others.   <u>See</u> <u>United States v. Colon</u>, 480 Fed. Appx. 509, 513 (11th Cir. 2012) (concluding the district court did not abuse its discretion in allowing the government to admit a 12-year-old conviction for passing bad checks because the prior conviction involved a similar <u>mens</u> <u>rea</u>, intent to defraud, as the bank fraud and conspiracy charges the defendant faced at trial).

Second, the defendant's prior conviction for passport fraud is extremely probative given its nature as a crime of dishonesty.  Evidence of a witness's participation in fraud or making false statements is probative of truthfulness.   <u>See</u>, <u>e.g.</u>, <u>United States v. Sperling</u>, 726 F.2d 69, 74-75 (2d Cir. 1984) (false credit card applications); <u>United States v. Carlin</u>, 698 F.2d 1133, 1137 (11th Cir. 1983) (false license applications); <u>United States v. Reid</u>, 634 F.2d 469, 473-74 (9th Cir. 1981) (prior false statements).  Moreover, "[c]rimes involving dishonesty or false statement are

often more probative of the witness's lack of credibility than even more serious crimes involving violence." <u>Cathey</u>, 591 F.2d at 276.  This is true because one who was untruthful on prior occasions is more likely to be untruthful in the future, especially when their liberty is at stake. And evidence of the defendant's prior passport fraud conviction is particularly probative here, where the defendant is alleged to have made materially false statements in connection with efforts to obtain documents authorizing travel to and from the United States – just as in his prior federal case.

Finally, the defendant will not be unfairly prejudiced if impeached by evidence of his prior passport fraud conviction.  Here, the defendant faces a maximum penalty of life imprisonment, which gives him added incentive to testify falsely.  The credibility of the defendant will be crucial, especially since the victims will not testify in this matter as to the defendant's actions.  <u>See</u> <u>United States v. Redditt</u>, 381 F.3d 597, 601 (7th Cir. 2004) (permitting conviction for stealing electricity to be used for impeachment purposes even though it was more than ten years old because the defendant's credibility was a critical factor given "the complete contradiction between the defendant's testimony and the testimony of the government witness"). There is no other impeachment evidence as probative as the defendant's prior passport fraud conviction.  Consequently, the defendant's passport fraud conviction is not cumulative with any other impeachment evidence, and the prior conviction would allow the jury to fully assess the defendant's credibility.

Several other courts have permitted the introduction of convictions that were more than ten years old when the probative value substantially outweighed any prejudicial effect.  <u>See</u> <u>Prtichard</u>, 973 F.2d 905, 909-10 (13-year-old burglary conviction); <u>United States v. Callaway</u>, 938 F.2d 907, 911-12 (8th Cir. 1991) (19-year-old grand larceny conviction); <u>United States v.</u>

Murray, 751 F.2d 1528, 1533 (9th Cir. 1985) (18-year-old conviction for receiving stolen property); United States v. Spero, 625 F.2d 779, 780-82 (8th Cir. 1980) (22-year-old grand theft conviction); United States v. Brown, 603 F.2d 1022, 1027-29 (1st Cir. 1979) (burglary and petty larceny convictions from 15 to 19 years old).  This is likely because "[a] crime involving dishonesty is more likely to overcome Rule 609(b)'s presumption."  Cathey, 591 F.2d at 276.

In contrast, the cases finding stale convictions to have been erroneously admitted often involved prior convictions involving heinous facts, extreme age, or a lack of any special circumstances warranting their admission.  See United States v. Beahm, 664 F.2d 414, 417-19 (4th Cir. 1981) (11-year-old sodomy conviction); United States v. Cavender, 578 F.2d 528, 531-34 (4th Cir. 1978) (25-year-old sodomy conviction); United States v. Shapiro, 565 F.2d 479, 480-82 (7th Cir. 1977) (38-year-old bankruptcy fraud and 24-year-old income tax evasion convictions).

### 3. Fed. R. Evid. 609(a) Allows the Government to Attack the Defendant's Character for Truthfulness through Use of his 2008 Grand Theft Conviction

Fed. R. Evid. 609(a)(1)(B) provides that a prior conviction "punishable . . . by imprisonment for more than one year . . . must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence substantially outweighs its prejudicial effect to that defendant."  Here, the probative value of the defendant's 2008 conviction for larceny grand theft in the 3rd degree substantially outweighs any prejudicial effect. As an initial matter, the defendant's grand theft conviction is probative as to the defendant's honesty and character for truthfulness.  See United States v. Levine, 700 F.2d 1176, 1182 (8th Cir. 1983) (finding no abuse of discretion for allowing the government to cross-examine the defendant about a prior grand larceny conviction if the defendant chose to take the stand in his own defense); United States v. Del Toro Soto, 676 F.2d 13, 18 (1st Cir. 1982) (recognizing a

"grand larceny conviction could certainly have been introduced under Federal Rule of Evidence 609(a)(2) on the general question of the defendant's credibility"); United States v. DiLorenzo, 429 F.2d 216, 220 (2d Cir. 1970) (noting that a larceny felony conviction is a crime "which reflect[s] on honesty and integrity and thereby on credibility"); United States v. Ackridge, 370 F.Supp. 214, 218 (E.D.Pa. 1973) (observing that larceny "is relevant to the question of defendant's honesty and truth-telling capacity").

In addition, the defendant was not a minor when he committed this crime, and the conviction is not too remote in time to lose its relevancy. The defendant's grand theft conviction is not similar to any of the currently charged crimes the defendant is facing; therefore, less prejudice attaches to this prior conviction. See United States v. Greenidge, 495 F.3d 85, 97 (3d Cir. 2007) (noting that the prior conviction was not "sufficiently similar that the jury [would] come to the same conclusion with regard to the instant charge based on the introduction of the prior conviction") (internal quotation marks omitted). As previously noted, the defendant's credibility is of the upmost importance in this case since the victims will not be available to rebut any account he may offer.

The Court can also minimize any potential prejudice by instructing the jury that it could only consider the prior conviction in regard to the defendant's credibility, and that it does not constitute evidence that the defendant is a bad person or has a propensity to commit crimes. The Court can further instruct the jury that the prior conviction cannot serve as evidence that he committed the crimes charged in the indictment. See Greenidge, 495 F.3d 97-98. On balance, the jury is entitled to hear about the defendant's prior dishonest conduct should he testify on his own behalf, as the probative value of his grand theft conviction substantially outweighs any

prejudicial effect.  This is especially true since any prejudicial effect can be mitigated with appropriate limiting instructions.

In sum, the government intends to use both the defendant's 1998 federal conviction for making a false statement in the application and use of a passport and the defendant's 2008 state conviction for larceny grand theft in the 3rd degree should he testify in his defense at trial.  By testifying, the defendant puts his character for truthfulness at issue, and it is proper for the government to impeach the defendant with specific instances of prior convictions.   The defendant's prior convictions are probative of his truthfulness and credibility as a witness.

## CONCLUSION

The United States respectfully submits that the statements of various declarants contained in recorded calls with the defendant or in Facebook exchanges with the defendant are admissible to provide context.  Further, some statements are admissible under Fed. R. Evid. 803(3) because they show the declarant's then-existing state of mind.  In addition, evidence that the defendant operated a business enterprise involving prostitution both before and after the dates contained in Count 4 of the Indictment is admissible to show the recurring nature of the defendant's unlawful

enterprise.  Finally, the United States respectfully submits that it should be allowed to impeach

the defendant with his previous federal and state convictions should he testify at trial.

Respectfully submitted,

VANITA GUPTA
DEPUTY ASSISTANT ATTORNEY GENERAL

By:    s/Matthew T. Grady
Matthew T. Grady
S.D.Fla Bar Number:  A5502172
Trial Attorney
DOJ, Civil Rights Division, Criminal Section
950 Pennsylvania Ave., N.W. (PHB)
Washington, DC 20530
Telephone:  202-353-1216
Facsimile:  202-514-6588
Matthew.Grady@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th day of November 2016, the undersigned
electronically filed the foregoing document with the Clerk of the Court, and served a copy upon
counsel of record for the defendant, using CM/ECF.

s/Matthew T. Grady
Matthew T. Grady
Trial Attorney