```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                   CASE NO. 1:16-CR-20345-KMM-1


 3
     UNITED STATES OF AMERICA
 4                                      Miami, Florida
                                        March 14, 2017
 5          vs.                         Tuesday


 6
     JEFFREY JASON COOPER               Scheduled 11:00 a.m.
 7                                      10:37 a.m. to 11:48 a.m.


 8                                      Pages 1 - 44
     -----------------------------------------------------------

 9

10                        SENTENCING HEARING


11
                 BEFORE THE HONORABLE K. MICHAEL MOORE
12              UNITED STATES CHIEF DISTRICT COURT JUDGE


13

14   APPEARANCES:


15
     FOR THE GOVERNMENT:       MATTHEW T. GRADY, ESQ.
16                             United States Department of Justice
                               601 D. Street NW
17                             Suite 5343
                               Washington, DC 20004

18

19   FOR THE DEFENDANT:        GENNARO CARIGLIO, JR., ESQ.
                               10800 Biscayne Boulevard
20                             Suite 900
                               Miami, Florida  33161

21

22
     STENOGRAPHICALLY
23   REPORTED BY:              GLENDA M. POWERS, RPR, CRR, FPR
                               Official Court Reporter
24                             United States District Court
                               400 North Miami Avenue, Room 08S33
25                             Miami, Florida 33128
```

```
 1                    I N D E X

 2

 3  WITNESS                                        PAGE

 4                  GOVERNMENT'S EVIDENCE

 5

 6  SPECIAL AGENT HUY NGUYEN

 7      Direct Examination by Mr. Grady              9

 8      Cross-Examination by Mr. Cariglio           11

 9      Redirect Examination by Mr. Grady           17

10

11  SPECIAL AGENT HUY NGUYEN

12      Direct Examination by Mr. Grady             33

13      Cross-Examination by Mr. Cariglio           35

14      Redirect Examination by Mr. Grady           41

15

16

17

18

19

20

21

22

23

24

25
```

1                    (Call to the order of the Court:)

2            COURTROOM DEPUTY:  The Honorable Chief Judge K. Michael

3    Moore presiding.  Court is back in session.

4            THE COURT:  Good morning.

5            COURTROOM DEPUTY:  United States of America versus

6    Jeffrey Jason Cooper.

7            Counsel, note your appearances, please.

8            MR. GRADY:  Good morning, Your Honor.  Matthew Grady

9    from the Civil Rights Division of the Department of Justice.

10           THE COURT:  Good morning.

11           MR. CARIGLIO:  Good morning, Your Honor.  Gennaro

12   Cariglio on behalf of Jeffrey Cooper, who's present in court.

13           THE COURT:  Good morning.  Okay.  I want to take up

14   objections to the pre-sentence investigation report.

15           MR. CARIGLIO:  Yes, Your Honor.

16           THE COURT:  So, if we can chronologically -- the

17   easiest for me to go through is the way that they are listed in

18   the report -- let's see here -- in the addendum.  So, the first

19   issue relates to paragraph 14 and was resolved; right?

20           MR. CARIGLIO:  Correct.

21           THE COURT:  Okay, done.

22           The second one by the Government, it was resolved?

23           MR. GRADY:  Yes, Your Honor.

24           THE COURT:  Third one by the Government, resolved?

25           MR. GRADY:  Yes, Your Honor.

1          THE COURT:  Fourth one by the Government, resolved?

2          MR. GRADY:  Yes, Your Honor.

3          THE COURT:  Fifth one by the Government, resolved?

4          MR. GRADY:  Yes, Your Honor.

5          THE COURT:  Sixth one by the Government, resolved?

6          MR. GRADY:  Yes, Your Honor.  I'm not sure exactly

7    which exactly we are on.

8          THE COURT:  We are at paragraph 39.

9          MR. GRADY:  Yes, Your Honor.

10         THE COURT:  Paragraph 40.

11         MR. GRADY:  Forty, regarding restitution, I believe

12   that's one issue that we'll have to resolve today.

13         THE COURT:  Okay.  So this is a restitution; right?

14         MR. GRADY:  Yes, Your Honor.

15         THE COURT:  Go ahead, and why don't you make your

16   argument.

17         MR. GRADY:  Sure, Your Honor.  I set forth the

18   calculation in our memo to the Court, which I'm sure the Court

19   has reviewed, but restitution is obviously required under 18

20   United States Code 1593 in this case.

21         And while we do not have losses under 2259-B3, we did

22   calculate the value of the victims' services to the defendant

23   and, of course, I set that value in our pleading based upon the

24   Bayshore Yacht & Tennis Club records, which was Government's

25   11A introduced at trial, and there was roughly 90 visits to the

1    apartments where the victims lived and worked out of.

2         And when we calculated 90 times the $160 rate, that

3    would be what the defendant charged -- we got 14,400;

4    multiplying that by 60 percent, which is what the defendant

5    received, the amount the Government believes should be 8,320.

6         What the Government would point out, Your Honor, is the

7    very conservative nature of this number.

8         Again, you have trial testimony from Ms. Pena, who

9    stated that she scheduled eight to ten clients per day.  If you

10   multiply eight to ten clients by seven, which is a week, that's

11   roughly $7,000 in proceeds.

12        And, of course, the Bayshore Yacht & Tennis Club might

13   not have calculated people who might have entered without

14   signing the log, and that also does not account for any out

15   calls that the victims would be sent on at the defendant's

16   behest.  So the Government feels that that number is very

17   conservative.

18        The other thing the Government would point out that was

19   not in our brief is that the Government believes an additional

20   $1,260 should be ordered in restitution to represent the rent

21   that victim one and victim two provided to the defendant per

22   week.

23        In PSI, paragraph 18, it details how they were required

24   to each provide $70 per week to the defendant and 180 -- or

25   excuse me -- 140 times nine weeks is that $1,260 amount.

1            And the Government would point out the case is the

2    United States versus DeGuzman -- it is 133 Federal Appendix

3    531, it's a 2005 decision from the Tenth Circuit, where the

4    Court did order restitution for rent payments to the defendant

5    in a similar type of case.

6            The defendant in that case was charged with wire fraud,

7    mail fraud, alien harboring, inducing an alien to enter

8    unlawfully, that the defendant was seen bringing individuals by

9    H1B Visa program, and instead of doing the IT work, as they

10   were promised, they did not do IT work.

11           But the Court in that case stated that:

12           It would seem to me that but for the defendant's scheme

13   to lure Filipino citizens into this country, none of the rest

14   of this would have happened, and so that district court judge

15   ordered that be paid under 3663A.

16           So the Government submits that the revenue payments are

17   leading up to -- or should be a basis for restitution, both

18   under 3663A and 1593.

19           THE COURT:  Well, I'm -- first of all, on the -- in the

20   addendum to the pre-sentence report where you're saying that

21   the restitution says $4,320.

22           MR. GRADY:  That is per victim, Your Honor; 4,320 for

23   victim one, and then 4,320 for victim two.

24           THE COURT:  So a total of 8,640?

25           MR. GRADY:  Yes, Your Honor.

1          THE COURT:  That's what you're claiming as restitution?

2          MR. GRADY:  As restitution, plus an additional --

3          THE COURT:  You didn't make that in your objection.

4          MR. GRADY:  That's correct, Your Honor.

5          THE COURT:  So any new argument is untimely.

6          MR. GRADY:  Okay.

7          THE COURT:  Okay.  And so what you're arguing about is

8    the same amount, 8,640?

9          MR. GRADY:  Yes, Your Honor.

10         THE COURT:  Now, the probation officer has said that we

11   don't have the contact information for victims one and two.

12         MR. GRADY:  That's correct, Your Honor, although, the

13   case agent has recently reached out and been in contact with

14   victim one, who has indicated that she would accept half of the

15   restitution order and donate the remaining half of the

16   restitution order.

17         And that victim two has indicated that she does not

18   wish to receive restitution.  But the Government would point

19   out, the Court still must order restitution under the statute,

20   and then if she does not wish to receive it, that can go to the

21   Crime Victims' Fund.

22         THE COURT:  Well, how can the probation officer confirm

23   the losses and the address where to send it?

24         MR. GRADY:  Sure.  We can attempt to put the probation

25   officer in touch with the case agent to reach out to victims

1    one and two, but I'll note for the Court that for the reasons

2    that also the Government did not have a deposition in this

3    case, victim one and victim two have been less responsive

4    because they have been trying to put this event behind them,

5    and so I'm not quite sure what future success attempts to

6    contact will or will not have.

7           THE COURT:  Okay.  What's the defense response?

8           MR. CARIGLIO:  Judge, we would object to any

9    restitution in this matter.  First, we would argue that, as the

10   defense, we haven't been given an opportunity to refute what

11   the Government is alleging.

12          So, because we haven't been given an opportunity to

13   refute what the Government is alleging, we'd ask to call

14   Agent Nguyen to the stand so I can question him about his

15   witnesses.

16          THE COURT:  It's the Government's burden, so call your

17   witness.

18          MR. GRADY:  Okay, Your Honor.  The Government calls

19   Special Agent Huy Nguyen.

20          COURTROOM DEPUTY:  Raise your right hand.

21          Do you solemnly swear that the testimony you're about

22   to give will be the truth, the whole truth, and nothing but the

23   truth, so help you God?

24          THE WITNESS:  I do.

25          COURTROOM DEPUTY:  Thank you.  Please be seated, and

1   would you please state your full name for the record and spell

2   it.

3             THE WITNESS:  First name is it Huy, H-U-Y, Nguyen,

4   N-G-U-Y-E-N.

5             COURTROOM DEPUTY:  Thank you.

6             (SPECIAL AGENT HUY NGUYEN, after having been first duly

7   sworn, was examined and testified as follows:)

8                       DIRECT EXAMINATION

9   BY MR. GRADY:

10  Q.  Good morning, Agent Nguyen.

11      Where do you work?

12  A.  Department of Homeland Security, Homeland Security

13  Investigations.

14  Q.  Have been the case agent for this case United States versus

15  Cooper?

16  A.  Yes.

17  Q.  As the case agent, has that included contact with victim

18  one and victim two?

19  A.  Yes.

20  Q.  I want to fast-forward to contact that you've had with

21  victim one and victim two since the trial in this case; okay?

22  A.  Okay.

23  Q.  Have you attempted to make contact with victim one and

24  victim two?

25  A.  Yes, I have.

1    Q.   Let's start first with victim one.

2         How many times, roughly, have you attempted to contact

3    victim one since the end of trial?

4    A.   It's hard to say.  I would message -- I would send a

5    message and then she would respond several days later, so there

6    was never any continuous contact, except for maybe a couple

7    times.  But I would say, an estimate, less than a dozen times.

8    Q.   What methods did you use to attempt to contact victim one?

9    A.   It was mainly Skype, Skype.

10   Q.   What did you tell victim one had happened at trial?

11   A.   That the defendant was found guilty.

12   Q.   When you attempted to contact victim one, what did you ask

13   her about?

14   A.   We attempted to get a victim impact statement from victim

15   one, as well as further -- later on down the line, we tried to

16   get contact information for restitution.

17   Q.   Specifically, as to restitution, what has victim one said

18   about receiving restitution in this matter?

19   A.   That she would receive half and she would donate the other

20   half to a victim fund.

21   Q.   When did you receive this information?

22   A.   This was this past Saturday.

23   Q.   As to victim two, have you made similar contacts to

24   communicate with victim two?

25   A.   Yes, I did.

1    Q.   What has been the result of those contacts?

2    A.   Victim two was mainly concerned about her name getting out

3    into the press and that her family and her friends and contacts

4    would find out, so she chose not to take any restitution in

5    fear that her name would be released to the public.

6         MR. GRADY:  No further questions at this time,

7    Your Honor.

8         THE COURT:  Cross?

9         MR. CARIGLIO:  Thank you, Your Honor.

10                        CROSS-EXAMINATION

11   BY MR. CARIGLIO:

12   Q.   Good morning, Agent.

13   A.   Good morning, sir.

14   Q.   These restitution calculations that the Government

15   submitted to the Court were based on visitor logs to the

16   Bayshore Yacht & Tennis Club; correct?

17   A.   I believe so, yes.

18   Q.   And would it be fair to say that you were never able to

19   confirm from the visitor logs whether all of these visitors had

20   massages performed; correct?

21   A.   Not all of them.

22   Q.   Okay.  Well, could you, as you sit here today -- because

23   we're in the middle of a restitution hearing -- could you

24   please identify for the Court any particular visitor that spoke

25   to you that said that they'd received a massage from Aliya,

1    victim number one?

2    A.   I don't recall off the top of my head, however, there were

3    reports that you were provided that did answer those questions

4    that you're asking.

5    Q.   Well, it's your burden of proof as the Government to prove

6    out this restitution.  So I'm asking, I take it, you prepared

7    for sentencing here today; correct?

8    A.   Not in regards to your contentions for restitution.

9    Q.   So would the answer to my question be, as we sit here

10   today, you cannot tell Judge Moore who, specifically, from

11   those 90 people, said that they received essential massage or

12   any massage from Aliya; would that be fair?

13   A.   No, that wouldn't be fair, but I believe at least one,

14   Samuel Jicon (phonetic) stated that he did.

15   Q.   Okay.  So Samuel Jicon, that's one out of 90 people on the

16   visitor log; correct?

17   A.   Yes.

18   Q.   All right.  And did Samuel Jicon tell you he received a

19   massage from Aliya, victim number one, or Zhanna, victim number

20   two?

21   A.   I don't recall that.

22   Q.   So we don't even know who received the money from Samuel

23   Jicon, correct, as we sit here today?

24   A.   Yes.

25   Q.   Now, can you name any other person, other than Samuel

1    Jicon, who told you that they received a massage from either

2    Aliya or Zhanna?

3    A.   Again, I don't recall the names.

4    Q.   Okay.  And you would also agree with me that the people

5    that you spoke to in relation to those 90 people that are

6    listed on the visitor log, there was a very small percentage of

7    them that actually told you that they received massages;

8    correct?

9    A.   I'm sorry, agree with you in saying what?

10   Q.   Well, let me ask -- strike that question.

11        Out of the 90 people that were on the visitors' log, how

12   many did you interview?

13   A.   I would say only a couple.

14   Q.   Okay.  All right.  Let me ask you this:

15        When you first spoke to Aliya, did Aliya tell you that she

16   never performed any sensual massages for Jeff Cooper when you

17   first spoke to her?

18   A.   You're going to have to refresh my memory with the report.

19   Q.   Well, do you recall?

20   A.   We interviewed her several times.

21   Q.   I know you interviewed her at least three times; correct?

22   A.   At the very least.

23   Q.   Right.  You first met her the night she was detained by the

24   Miami-Dade police officer, right, in the undercover operation?

25   A.   That's correct.

```
1    Q.   Right.  And when you first came into contact with her that

2    night, did she deny performing any sensual massages for

3    Mr. Cooper?

4    A.   If you're looking for accuracy, you're going to have to

5    refresh my memory, sir.

6    Q.   I'm asking you what you recall.

7    A.   I don't recall.

8    Q.   Do you recall her ever, at any time, from the beginning of

9    this investigation, until we sit here today, telling you that

10   she never performed sensual massages for Jeff Cooper?

11   A.   Again, I don't recall, but you're more than welcome to

12   refresh my memory.  I know that that's -- it's happened, maybe

13   not in this specific case, but if you refresh my memory, I

14   would be more accurate.

15   Q.   Okay.  I'm just asking you with respect to this specific

16   case.  Is your answer 'I don't know'?

17   A.   My answer is I don't recall, and you could refresh my

18   memory, sir.

19   Q.   What about Zhanna --

20   A.   Same.

21   Q.   -- victim number two -- let me ask my question.

22        Did Zhanna ever tell you when you interviewed Zhanna that

23   she never performed sensual massages for Jeff Cooper?

24   A.   The answer is the same.

25   Q.   Which is?
```

1   A.   That I don't recall.

2   Q.   And did Aliya, victim number one, ever tell you that she

3   performed 45 sensual massages?

4   A.   I'm not sure exactly where you got that number, sir, but I

5   don't recall that.

6   Q.   Well, I'm looking at document number 119, it's part of the

7   Government's request for restitution.  It says:

8        Consequently, 90 prostitution dates over the course of

9   eight weeks would equal a little over 11 prostitution dates per

10  week.

11       So the Government is basically dividing this -- taking a

12  number based on those 90 dates and dividing them in half

13  between Aliya and Zhanna.

14       So my question to you is, did a Lee a ever tell you that

15  she performed 45 sensual massages for Jeff Cooper?

16  A.   She did not specifically say 45.

17  Q.   Okay.  Did she ever admit to performing any sensual

18  massages for Jeff Cooper, other than that meeting with the

19  undercover Miami-Dade officer?

20  A.   Could you please repeat that question?

21       You're saying -- you're asking me if she's ever admitted --

22  Q.   Did Aliya ever admit to performing any sexual -- sensual

23  massages for Jeffrey Cooper?

24  A.   I believe she did.

25  Q.   Other than the Miami-Dade police officer?

1   A.   I believe there's reports that say that she did.

2   Q.   Who?

3   A.   I'm sorry?

4   Q.   Who did she specifically admit that she performed the

5   sensual massage on --

6   A.   Again, I don't recall.

7   Q.   -- for Jeffrey Cooper?

8   A.   Again, I don't recall the specific names.

9   Q.   How many people did she say that she performed sensual

10  massages on for Jeffrey Cooper?

11  A.   I don't have that information either.

12  Q.   Okay.  And the same question about Zhanna, victim number

13  two, did Zhanna, victim number two, ever admit to performing

14  sensual massages for Jeffrey Cooper, other than that offer to

15  the Miami-Dade police officer?

16  A.   I believe she did.

17  Q.   Okay.  How many?

18  A.   I don't recall the number.

19  Q.   Who?  Who did she admit to?

20  A.   Again, I don't recall the number, but I'm sure there's

21  reports that say that.

22       MR. CARIGLIO:  Judge, I have no further questions.

23       THE COURT:  Redirect.

24

25

```
 1                         REDIRECT EXAMINATION

 2   BY MR. GRADY:

 3   Q.   Agent Nguyen, when you arrived at Bayshore Yacht & Tennis

 4   Club, did you look up the Florida driver's license information

 5   for the individuals listed in the Bayshore Yacht & Tennis Club

 6   visitor log?

 7   A.   Yes, I did.

 8   Q.   Where were a majority of the addresses for those individual

 9   located in?

10   A.   In South Florida.

11   Q.   Did you take copies of these driver's licenses and show

12   them to victim one and victim two?

13   A.   Yes, I did.

14   Q.   Did victim one and victim two identify maybe half a dozen

15   to a dozen of those individuals?

16             MR. CARIGLIO:  Objection.  Leading.

17             THE COURT:  Sustained.

18   BY MR. GRADY:

19   Q.   Did you show these pictures to victim one and victim two?

20   A.   Yes, I did, when we interviewed them in Kazakhstan.

21   Q.   Were they able to identify them as potential clients?

22   A.   Yes, they did.

23   Q.   How many, roughly, do you think they were able to identify

24   as possible clients?

25   A.   Again, I don't recall the specific number, but I believe
```

1    there's reports that state that.

2    Q.  Was there some out there they were able to identify?

3    A.  Yes, they were.

4    Q.  Did you talk to an individual by the name of

5    Gene Sandoval (phonetic) as part of this investigation?

6    A.  Yes, I did.

7    Q.  What did he tell you?

8    A.  That he received sensual massages at the Bayshore Yacht &

9    Tennis Club.

10   Q.  Who did he receive these from?  Was it -- strike that.

11       Was it victim one or victim two that provided these

12   services?

13   A.  I believe so.

14   Q.  Finally, Agent Nguyen, do you recall the testimony of

15   Ms. Pena during the trial?

16   A.  Some parts, yes.

17   Q.  Was she the defendant's secretary at times while he was in

18   California?

19   A.  Yes.

20   Q.  Did her responsibilities include scheduling dates for

21   victim one and victim two?

22       MR. CARIGLIO:  Objection.  Leading.

23       THE COURT:  Sustained.

24   BY MR. GRADY:

25   Q.  What were some of her responsibilities?

1   A.   She, basically, answered phones and booked clients for

2   Mr. Cooper.

3   Q.   Who were these clients going to see?

4   A.   During that time, either victim one or victim two.

5   Q.   Finally, Agent Nguyen, going -- I want to turn your

6   attention to the Backpage results that you received as part of

7   this investigation.

8        Did some of those Backpage ads include an address?

9   A.   Yes, they did.

10  Q.   And again, these are the Backpage ads that I'm referring to

11  are the ones that are connected to the defendant, Mr. Cooper.

12  What was the address that was listed in those Backpage ads?

13  A.   I think it was the address for the Bayshore Yacht & Tennis

14  Club.

15  Q.   Did some of these ads also post advertisements for work and

16  travel students?

17  A.   Yes, they did.

18  Q.   And, roughly, how many ads were posted by the defendant in

19  the summer of 2001?

20  A.   Again, I don't recall the specific number, but there were

21  many.

22  Q.   Maybe, would you guess, hundreds?

23            MR. CARIGLIO:  Objection.  Leading.

24            THE COURT:  Sustained.

25            THE WITNESS:  I would.

1          MR. GRADY:  No further questions, Your Honor.

2          THE COURT:  Where is this reference in the addendum to

3   the log sheet at the tennis club, where is that in the offense

4   conduct, is that noted in the offense conduct anywhere?

5          MR. GRADY:  I don't know if it is, off the top of my

6   head, Your Honor, but I do have a copy of the exhibit that was

7   admitted at trial for the Court's benefit, if you prefer to

8   have a copy.

9          THE COURT:  What is that that you're holding in your

10  hand?

11         MR. GRADY:  This is Government Exhibit 11A, Your Honor,

12  that was introduced at trial.  This is the visitor log for the

13  Bayshore Yacht & Tennis Club.

14         And again, the Government's restitution calculation

15  comes from the number of individuals that were going to 104 or

16  914, again, those were the apartments that the victim one or

17  victim two either lived in or sought dates out of.

18         THE COURT:  And what's the total number on that?

19         MR. GRADY:  The total number the Government has

20  submitted is, roughly, 90 individuals.  And so, again, that was

21  the basis for the Government's restitution calculation, which

22  again, the Government feels is very conservative, given

23  Ms. Pena's trial testimony that she scheduled between eight to

24  ten clients per day.

25         THE COURT:  And so your evidence is that exhibit --

1    which I think you ought to make a part of the record for

2    today's proceedings or appellate review purposes -- and the

3    testimony that it would be -- the math would be 90 visits times

4    $160 times point 60?

5            MR. GRADY:  Yes, Your Honor, that's exactly correct.

6    And again, the basis for all that comes from the trial

7    testimony that the defendant charged $160 per sexual acts, and

8    again, that's from multiple individuals that we cited to docket

9    entries and put on record as part of our pleading.

10           THE COURT:  Okay.  Any other argument on that?

11           MR. CARIGLIO:  Yes, Judge.

12           THE COURT:  Any other witnesses, either way, for either

13   side?

14           MR. GRADY:  Not from the Government, Your Honor.

15           MR. CARIGLIO:  Not from the defense.

16           I don't believe that was the testimony at all.  As you

17   recall, we never heard from either Aliya or Zhanna at this

18   case.

19           THE COURT:  Right.

20           MR. CARIGLIO:  The Court did let in, you know, several

21   statements that they made and let in, over the defense's

22   numerous objections.

23           But there was never any testimony from Aliya or Zhanna

24   that -- through these other witnesses that they specifically

25   received 160 massages -- 160 per sensual massage, number one.

1          Number two, there was also never any testimony from

2     these witnesses that they started performing sensual massages

3     right off the bat, as opposed to regular massages, which were

4     less.

5          Number three, there was also photographs that were

6     introduced that demonstrated that both Aliya and Zhanna were

7     going out with other males that they had met and, you know,

8     going out to various different night clubs.

9          So what the Government's doing is -- and there's also

10    no testimony -- there was no specific testimony at trial that

11    Aliya or Zhanna were present at the time -- in these apartments

12    at the time that these visitors signed in.

13         They never linked the visitor logs to Aliya and Zhanna,

14    other than the overall time frame.  You had other women who

15    were also overlapping with Aliya and Zhanna.  One of them that

16    comes to mind was Oxana -- and her last name begins with an

17    "M" -- I'm going to butcher it if I pronounce it.

18         And then there was another witness that testified

19    that -- she was actually a favorable witness for the defense --

20    that the Government called, that she actually rented out those

21    apartments and voluntarily -- from Mr. Cooper -- and

22    voluntarily performed massages with -- I think her words were

23    "happy endings."

24         So, you know, there are other people using those

25    apartments.  The Government just basically makes this rough

1   guess that all of these people were for massages, makes this

2   rough guess that one of these two women have to be performing

3   these massages and then just splits it down the middle for

4   restitution.

5        We have victim number two, who doesn't even want

6   restitution.  There's no contact even to give her restitution.

7        And the same thing with victim number one, Agent Nguyen

8   speaks to her on Saturday, he's here, preparing -- he's the

9   lead agent in this case, he should be preparing for this

10  restitution hearing.

11       He never confirms with her that she did 45 sensual

12  massages.  The evidence that we have -- and I understand the

13  Government has the low burden, but the evidence that we have is

14  that one person said that they received a sensual massage from

15  either Aliya, victim one, or Zhanna, victim two, that's it,

16  that's all the Government's proven just now.

17       So we would object to any restitution whatsoever.

18       MR. GRADY:  Your Honor, if I may, just a brief

19  rebuttal.  I think the defense is seeking a level of certainty

20  that's just not required in the case law.

21       The case law of Cortes Catrovich (phonetic) says that

22  restitution is an inexact science, but the Court should just

23  have the reasonable basis behind it.

24       And the Government would suggest that at trial there

25  were multiple witnesses who testified that the rate that the

1    defendant charged was $160.  That came from Ms. Makarova,

2    Ms. Mamaeva, Ms. Pena, Ms. Cortina, and again, there was

3    testimony from the defendant's secretary that he received 60

4    percent of the proceeds.  So the Government believes that there

5    is a well-founded basis, based upon what the victims said to

6    the Court.

7           And finally, as to victim two, you know, participation

8    or desire to have restitution.  The Government would rely on

9    18 USC 3664(g)(1), which states that a victim is not required

10   to participate in the restitution process.

11          But again, here, 1593 mandates that restitution should

12   be ordered; and if she does not want to participate, that

13   restitution can be given to the Crime Victims' Fund.

14          THE COURT:  Okay.  Anything further on that?

15          MR. CARIGLIO:  No, Your Honor.

16          MR. GRADY:  No, Your Honor.

17          THE COURT:  Well, I think the law does only require

18   that there be a reasonable calculation based on a preponderance

19   of the evidence.  And from the evidence that I recall, the

20   trial testimony, as well as the evidence contained in the

21   offense conduct section of the pre-sentence investigation

22   report, there's sufficient evidence to conclude that the amount

23   being requested is certainly a conservative estimate of the

24   victim's losses, and that being $8,640.

25          There are references at paragraph 17 of the

1    pre-sentence investigation report to the undercover officer

2    referring to Unit 914, that costs $350 for sexual intercourse;

3    and paragraph 18, law enforcement discovered victim one and

4    victim two were from Kazakhstan and brought in the United

5    States on J-1 Visas, sponsored by Company A.

6           They were identified, they stayed at -- or resided with

7    Cooper at apartment two or three, reported they had to ask

8    Cooper for permission to leave the apartment and inform them of

9    their whereabouts at all times, stated Cooper kept 60 percent

10   of their proceeds from massages they performed and they were

11   each charged $70 per week for rent.

12          Cooper told A.O. and Z.R. that a regular massage was

13   $60 and a sensual massage was $160.

14          When you include that with the log and the 90 entries

15   there, I think you can make the calculation, the $8,640 was a

16   bare minimum of the restitution that should be entered.

17          There's also other collateral evidence to support that,

18   on page 32 -- paragraph 32 -- we're referencing the Backpage

19   advertisements -- at page 33 -- paragraph 33, at page 38 and

20   37, which includes the cash deposits.

21          I overlooked paragraph 34.  All that notes is,

22   essentially, uncontested impact statements is sufficient to

23   give the Court a reasonable basis to require restitution.

24          So that was the Government's objection to -- I'll

25   sustain the Government's objection and order restitution in the

1    amount of $8,640.

2         All right.  The next objection from the Government is

3    at paragraph 57 and 62?

4         MR. GRADY:  Yes, Your Honor.  That has been resolved.

5         THE COURT:  The next objection is from the Government

6    to a special instruction found at 2G1.1 of the guidelines.

7         The Government -- or the probation officer's

8    re-calculated that; correct?

9         MR. GRADY:  That's correct, Your Honor.  They did

10   recalculate the victims, essentially, groups 9 through 15 was

11   originally calculated at 34.  That has been re-calculated to

12   9-14, and so that issue has been resolved.

13        So, I guess, as an offshoot of that, there was an issue

14   as to whether groups 9 through 15 constituted victims, under

15   2G1.1(d), which, of course, the Government -- based upon the

16   plain language of that, in addition to Jenkins -- believes that

17   they are properly classified as victims under the guidelines.

18        THE COURT:  Okay.

19        That takes care of all the Government's objections?

20        MR. GRADY:  Yes, Your Honor.

21        THE COURT:  Okay.  Defense objections?

22        MR. CARIGLIO:  Judge, we object to paragraph 27.  There

23   was no --

24        THE COURT:  Let me see, the first one is --

25        MR. CARIGLIO:  Fourteen, which was resolved.

1          THE COURT:  The next one is 27?

2          MR. CARIGLIO:  Yes, Judge.  Paragraph 27, it's some of

3    the offense conduct.  However, the information in paragraph 27

4    was never presented at trial, was never subject to any

5    cross-examination of me because it wasn't presented at trial,

6    so we'd object to this being in the offense conduct at all.

7          THE COURT:  Okay.  What's the Government's response?

8          MR. GRADY:  Your Honor, the Government's response is

9    that it provided the police reports involving the defendant's

10   arrest with Bars, Hichoda (phonetic), and when you combine the

11   police report with that incident, with the trial evidence that

12   the defendant, essentially, had multiple women providing sex

13   acts via the use of Backpage, the Government feels that there

14   is a basis for this Court to rely upon what this Court can

15   consider hearsay information the Court can consider.

16         THE COURT:  Well, where is the evidence?

17         Had you put on any evidence?

18         MR. GRADY:  No, Your Honor.  We submitted the exhibits

19   to our pleading with the police reports that the case agent

20   obtained as to the defendant, opposed -- to make sure of that.

21         I also note, Your Honor, that ultimately with respect

22   to all of these other people who are contained in groups 9

23   through 15, there is no effect on the guidelines, in that they

24   are nine or more levels below the highest offense level, so

25   it's not adjust the guidelines any with respect to their being

1    groups or not.

2        THE COURT:  Well, I understand, if it doesn't make a

3    difference in terms of the guidelines calculations, I can note

4    it, but I just want to know, where is -- have you presented the

5    Court with information to support paragraph 27?

6        MR. GRADY:  No, Your Honor.

7        THE COURT:  Well, do you want to go forward with it or

8    do you want to just delete paragraph 27?

9        MR. GRADY:  We can delete paragraph 27.

10       THE COURT:  Okay, all right, so 27 is out.  Sustained.

11       MR. CARIGLIO:  Judge, we have a objection to --

12       THE COURT:  Paragraph 28.

13       MR. CARIGLIO:  Paragraph 28.  Now, the first sentence

14   has already been resolved, because the Government objected to

15   that as well.  We were in agreement, and we just disagree with

16   the balance of what's contained in paragraph 28.

17       THE COURT:  Okay.  What's the Government's response?

18       MR. GRADY:  The Government's response is that this was

19   essentially taken care of at trial, because at trial

20   Ms. Magrofo was specifically asked whether she performed

21   full-service for the defendant.

22       She said that she did not, even though that he wanted

23   her to perform full service.

24       THE COURT:  So, she -- are you agreeing with the

25   defendant as to the objection?

 1          MR. GRADY:  I'm not sure it's the Government's -- not

 2   sure what the basis is for the defendant's objection because

 3   most of what comes from paragraph 28 was covered in her trial

 4   testimony.  For example --

 5          THE COURT:  When you say "most," I mean, you --

 6          MR. GRADY:  Yes, Your Honor, I'll be specific.  For

 7   example --

 8          THE COURT:  Do you agree, he's objecting to paragraph

 9   one:  During the course of the investigation, Cooper's

10   activities with victims one and two, law enforcement identified

11   several women who had worked for Cooper over the years,

12   including when victims one and two were working for Cooper.

13          MR. GRADY:  No, we agree that that's a truthful and

14   accurate statement.

15          THE COURT:  Are you objecting to that statement?

16          MR. CARIGLIO:  Yes, Judge.

17          THE COURT:  Okay.  And what was your evidence of that?

18          MR. GRADY:  Well, the evidence would be that the

19   witnesses that were at the trial, for instance, Ms. Makarova,

20   Ms. Mamaeva, Ms. Pena, Ms. Cortina, Ms. Morbach, all of them

21   testified that they had worked for the defendant and identified

22   victim one and two.

23          THE COURT:  Note the objection.  Denied.

24          The next sentence was one woman named O.M.

25          MR. CARIGLIO:  There was a witness, Judge, that

1    testified, that was O.M.

2              THE COURT:  You don't object to that?

3              MR. CARIGLIO:  No.

4              THE COURT:  How about the third sentence, "December

5    2010?"

6              MR. CARIGLIO:  No, Judge.

7              THE COURT:  How about the fourth sentence, "she

8    indicated?"

9              MR. CARIGLIO:  Well, Judge, we would object to -- the

10   fourth sentence is from December 2010.  We'd object to the fact

11   that she performed erotic massages for Cooper, but she did

12   testify to that.

13             THE COURT:  Okay.  So note the objection and deny it.

14             Next sentence.

15             MR. CARIGLIO:  We'd object to that as well, Judge.

16             THE COURT:  Government's evidence?

17             MR. GRADY:  The Government is fine with sustaining that

18   specific objection to that specific sentence.

19             THE COURT:  Delete that sentence.  Okay.

20             The next sentence, "she noted she would become

21   frightened of Cooper?"

22             MR. CARIGLIO:  Yes, Judge, I would definitely object to

23   that particular sentence.

24             THE COURT:  Did she testify to that?

25             MR. GRADY:  Your Honor, just going back, I think we

1    skipped a sentence where it says, "she reported Cooper often

2    requested her perform full service," et cetera.

3              That was covered in her trial testimony.

4              THE COURT:  I thought that's what we had covered.

5              MR. GRADY:  Oh, okay.

6              THE COURT:  Wait a minute.  Maybe it was my mistake,

7    but you said that -- let's back up here.

8              She indicated that Cooper expected her to always be

9    available and on call or texted during the late or early

10   morning hours.

11             MR. GRADY:  Right, that one is out, Your Honor, is the

12   Government's understanding.

13             THE COURT:  That one is coming out.

14             MR. GRADY:  And that was after the one where it says,

15   "she reported Cooper often requested."

16             THE COURT:  All right and the is the defense objecting

17   to that.

18             MR. CARIGLIO:  Yes, Judge.

19             THE COURT:  And that was based on the testimony?

20             MR. GRADY:  That was, Your Honor.  That was based on

21   her trial testimony.

22             THE COURT:  So deny that.

23             Next sentence, "she know that she would become

24   frightened."

25             MR. CARIGLIO:  I don't recall any trial testimony to

1    that, no.

2         MR. GRADY:  On redirect she did state that the

3    defendant would yell at her, so I guess to the extent that the

4    Government would still report that the sentence should include

5    that the defendant yelled at her.

6         THE COURT:  I will note the objection, denied, and note

7    that it wouldn't change the guideline range or where I would

8    otherwise sentence on the guideline range.

9         Okay.  The next to the last sentence?

10        MR. GRADY:  And again, Your Honor, the last sentence

11   comes directly from her trial testimony as to the amount that

12   she was able to obtain what she earned from the defendant.

13        THE COURT:  Note the objection and deny it.

14        That takes care of that objection.

15        Let's see, paragraph 30.

16        MR. CARIGLIO:  Yes, Judge, and that's similar to

17   paragraph number 27.  We don't believe that there was any

18   testimony from -- N.D. did not testify, and we would submit

19   that there was no trial evidence that N.D. ever worked for

20   Mr. Cooper or that N.D. was ever harassed or threatened by

21   Mr. Cooper.

22        MR. GRADY:  Your Honor, what the Government can do with

23   respect to paragraph 30, N.D., and also with respect to

24   paragraph 31, D.R., and paragraph 33, A.F., is we can have

25   Agent Nguyen testify as to those matters.

 1          THE COURT:  Okay.

 2          (SPECIAL AGENT HUY NGUYEN, previously sworn and still

 3     under oath, testified as follows:)

 4                         DIRECT EXAMINATION

 5     BY MR. GRADY:

 6     Q.   Good morning again, Agent Nguyen.

 7     A.   Good morning.

 8     Q.   As part of your investigation, did you interview an

 9     individual by the initial N.D.?

10     A.   Yes, I did.

11     Q.   How did you interview her?

12     A.   It was a telephonic interview.

13     Q.   Did you ask her if she worked for the defendant?

14     A.   Yes, I did.

15     Q.   Did you ask her what she specifically performed for the

16     defendant?

17     A.   I believe I did.

18     Q.   What did she do on behalf of the defendant?

19     A.   I believe she performed sensual massages as well.

20     Q.   Do you recall, roughly, how long she worked for the

21     defendant?

22     A.   Approximately, two months.

23     Q.   Did she ultimately stop working for the defendant?

24     A.   Yes, she did.

25     Q.   When she did, did the defendant harasses her in any way?

1    A.   I believe she said that he kept calling her and threatened

2    her many times with immigration.

3    Q.   Why would he threaten her with immigration?

4    A.   I believe she was out of status.

5    Q.   Turning next to an individual by the name of B.R., did you

6    speak with B.R. as part of this investigation -- or I will

7    refer to her as B.J.R.?

8    A.   Yes.

9    Q.   Did she work for the defendant?

10   A.   Yes, she did.

11   Q.   What did she do for the defendant?

12   A.   I believe, at the very least, performed sensual massages.

13   Q.   Was there ever an occasion that the defendant assaulted

14   B.J.R.?

15   A.   I believe there was at least one occasion.

16   Q.   What happened?

17   A.   I don't recall specific details, but if I recall correctly,

18   I believe she might have been punched in the face, if I recall

19   correctly.

20   Q.   Turning to AN individual by the initials A.F., did you

21   speak with A.F. as part of this investigation?

22   A.   Yes, I did.

23   Q.   Did she work for the defendant?

24   A.   Yes, she did.

25   Q.   What did she do for the defendant?

1    A.   Again, at the very least, performed sensual massages, if

2    not full service.

3    Q.   Was A.F. arrested in a law enforcement operation?

4    A.   I believe she was.

5    Q.   How did it come about?

6    A.   I believe it was an undercover operation with Miami Beach

7    Police Department.

8    Q.   Did they -- where did they encounter A.F.?

9    A.   Again, if I recall correctly, it was in a hotel on

10   Miami Beach.

11   Q.   As part of the operation, did A.F. call anybody?

12   A.   I believe she called Mr. Cooper.

13   Q.   Do you know what she told Mr. Cooper at that time?

14   A.   Again, if I recall correctly, I believe she told Mr. Cooper

15   that the client wasn't going to pay her and he came up to the

16   room to collect the money.  That's when they arrested him.

17        MR. GRADY:  Your Honor, the Government has no further

18   questions at the time.

19                    CROSS-EXAMINATION

20   BY MR. CARIGLIO:

21   Q.   Okay, let's start with paragraph 30, this N.D., okay.

22        Did you personally speak to N.D.?

23   A.   Yes, I did.

24   Q.   Okay.  Did N.D. -- I want to strike that.

25        You keep saying "if I recall correctly" to various

1    questions that the Government asked you on direct.

2         Are you sure of any of your answers when you preface your

3    statement with "if I recall correctly?"

4    A.   For the most part, yes.  But again, if you want to be

5    completely accurate, you could show me the reports.

6    Q.   It's not my burden.  It's the Government's burden.

7    A.   Okay.

8    Q.   So let's talk about N.D. for a second.

9         You were the case agent in this case; right?

10   A.   Yes, I was.

11   Q.   And one of your jobs in this particular case was actually

12   to get witnesses to come to court and testify against

13   Mr. Cooper; correct?

14   A.   I believe so.

15   Q.   Right.  And did you ask N.D. to come to court and testify

16   against Mr. Cooper?

17   A.   No, we did not.

18   Q.   And when you spoke to N.D., would it be fair to say that

19   N.D. never admitted to performing any type of sexual acts for

20   Mr. Cooper?

21   A.   I don't believe that's an accurate statement.

22   Q.   What specifically -- 'cause we want to be accurate here, so

23   what specifically did N.D. tell you that she did for

24   Mr. Cooper?

25   A.   I believe she said that she performed sensual massages and

1    stopped working for him when he kept on persisting that she

2    would perform full service.

3    Q.   Okay.  So you believe that she said that; right?

4    A.   I'm pretty sure.

5    Q.   So let's talk about what "sensual massages" is.

6         Did she ever say that she masturbated any clients for

7    Mr. Cooper?

8    A.   No, she did not.

9    Q.   Okay.  She used the term "sensual massage"; correct?

10   A.   Yes, she did.

11   Q.   All right.  So it would be fair to say that she never

12   specifically admitted to performing any sex acts whatsoever for

13   Mr. Cooper; correct?

14   A.   I don't believe that's fair to say.

15   Q.   Okay.  You're just speculating what she meant by "sensual

16   massage"; correct?

17   A.   I believe we went through the sensual massages for

18   Mr. Cooper at trial.

19   Q.   Right.  Not with N.D.; did we?

20   A.   No, we didn't.

21   Q.   Okay.  So as you sit here today, the best that you can tell

22   tell Judge Moore is that N.D. told you she performed sensual

23   massages for Mr. Cooper?

24   A.   Yes.

25   Q.   Without defining what "sensual massage" was?

1  A.  Yes.

2  Q.  Now, would it be also fair to say that N.D. was never

3  physically threatened by Mr. Cooper; wouldn't that be accurate?

4  A.  "Physically threatened" means?

5  Q.  Physically threatened, just a simple definition --

6  A.  Did he grab her by her throat physically?

7  Q.  -- of physically threaten?

8  A.  I don't believe she said that.

9  Q.  Okay.  So she never said that; correct?

10  A.  I believe she said that he would call immigration and get

11  her deported.

12  Q.  Right.  But he never physically threatened her; correct?

13  A.  I don't believe she said that.

14  Q.  Okay.  What was her immigration status?

15  A.  Well, again, if she was out of status, she didn't have any

16  immigration status.

17  Q.  You're sure of that?

18  A.  I don't believe so.  I don't believe she had immigration

19  status at that time.

20  Q.  Okay.  Let's move on to paragraph 31.

21     B.R., for her middle initial is "J," correct, so B.J.R.?

22  A.  Yes.

23  Q.  Now, did you ask B.J.R. to come to court and testify

24  against Mr. Cooper?

25  A.  Yes, we did.

1    Q.   And B.J.R. declined to come to court and testify against

2    Mr. Cooper; would that be fair to say?

3    A.   That's correct.

4    Q.   Now, did B.J.R. ever specifically tell you that she

5    masturbated clients on behalf of Mr. Cooper?

6    A.   I believe she did.

7    Q.   Okay.  From when to when?

8    A.   I don't recall the specific dates, but she said she worked

9    for him for quite awhile.

10   Q.   Now, what evidence do you have that Mr. Cooper ever punched

11   B.J.R.?

12   A.   Just her testimony -- or just her statements.

13   Q.   Okay.  And other than her making that allegation, did you

14   ever do any follow-up investigation on that whatsoever?

15   A.   No, I did not.

16   Q.   So you never tried to see if she filed a police report;

17   would that be fair?

18   A.   I believe we asked her, but I don't believe we got --

19   again, I don't recall.

20   Q.   Well, do you know if she ever filed a police report?

21   A.   I don't recall if she did.

22   Q.   Now, she also has a prior criminal record; correct?

23   A.   I believe she did.

24   Q.   All right.  So you were unable to corroborate what B.J.R.

25   said to you; would that be fair?

1    A.   Yes.

2    Q.   So, as a seasoned investigator, you would agree with me

3    that, you know, you don't know whether or not B.J.R. was

4    telling you the truth; would that be fair?

5    A.   I was unable to corroborate her statements.

6    Q.   No, I get that.  That was my last question.

7         But my question to you now and my next question is, would

8    it be fair to say that, as we sit here today, you don't know

9    whether or not B.J.R. was telling the truth; correct?

10             MR. GRADY:  Objection, Your Honor.  Speculation.

11             THE COURT:  Overruled.

12             THE WITNESS:  No, I do not.

13             MR. CARIGLIO:  Okay.

14   BY MR. CARIGLIO:

15   Q.   Now, let's move on to the next paragraph, paragraph 33,

16   A.F.  Did you ever speak to A.F.?

17   A.   Yes, I did.

18   Q.   Did you ask A.F. to come to court to testify against

19   Mr. Cooper?

20   A.   I don't believe we did.

21   Q.   Now, when you spoke to A.F., did A.F. ever admit to

22   masturbating any clients for Mr. Cooper?

23   A.   If I recall correctly, she had admitted to performing full

24   service for Mr. Cooper.

25   Q.   And she personally told you that?

1   A.   Again, if I recall correctly, yeah.

2   Q.   How sure are you of that?

3   A.   Again, there's a report that states that.  Let me correct

4   that.  There's a report that documents the interview with A.F.

5   Q.   Okay.  But you're not sure whether or not she actually said

6   that she performed full service for Mr. Cooper; correct?

7   A.   I believe she did.

8        And again, there's a report, we could refer to the report.

9   Q.   Now, did A.F. ever tell you that Mr. Cooper forced her to

10  do anything?

11  A.   Not that I recall.

12       MR. CARIGLIO:  Judge, I have no further questions.

13       THE COURT:  Redirect.

14                      REDIRECT EXAMINATION

15  BY MR. GRADY:

16  Q.   Agent Nguyen, you received a variety of questions dealing

17  with N.D., B.J.R. and A.F., and you stated that your report

18  would help you aid your recollection of those interviews?

19  A.   That's correct.

20       MR. GRADY:  Your Honor, we will have these part of the

21  appellate exhibit.  I'm showing him what we will label as

22  Exhibits B, C and D.

23  BY MR. GRADY:

24  Q.   Agent Nguyen, I handed you -- first, let's start with

25  Exhibit B.  Is that a report of your interview with N.D.?

```
 1    A.   Yes, it is.

 2    Q.   Turning to the second page of that report -- actually, if I

 3    can take the report back, I'd like for you to review the final

 4    paragraph, just read that silently to yourself, the first two

 5    sentences of that report and look up at me when you're done.

 6    A.   (Witness complied.)

 7    Q.   Thank you, Agent Nguyen.  I will take back Exhibit B.

 8         Did N.D. provide information to you regarding Mr. Cooper's

 9    association with the Army?

10    A.   She said that -- or he told her that he previously was in

11    the United States Army.

12    Q.   Did he also tell her about any connections he had with the

13    police?

14    A.   Yes, he did.

15    Q.   What did he say about that?

16    A.   That he had connections with the police.

17    Q.   Is that information that you heard from other witnesses as

18    part of this investigation?

19              MR. CARIGLIO:  Objection.  Leading.

20              THE COURT:  Sustained.

21    BY MR. GRADY:

22    Q.   Did you receive other information in the course of this

23    investigation about the defendant's contacts with police?

24    A.   I recall other people saying that.

25    Q.   Next, I'll refer to Exhibit C.
```

1        Is Exhibit C a report of your interview with B.J.R.?

2   A.   Yes, it is.

3   Q.   I'm going to take back Exhibit B for a minute and I'll

4   refer you specifically, Agent Nguyen, to the middle of the

5   last -- second to last paragraph in Exhibit B -- excuse me --

6   Exhibit C, and also the final sentence on the final paragraph,

7   Exhibit C.  Please read those to yourself silently.

8   A.   You said the second to the last paragraph?

9   Q.   Second to last paragraph -- excuse me -- just the first

10  page.  Second to last paragraph of the first page and then the

11  last sentence of the final paragraph on the first page.

12         THE COURT:  All right.  Let's go ahead and recess.

13  Folks, I think you were expected to notify us if you thought

14  that your hearing was going to take more than an hour.

15         Neither one of you did that; did you?

16         MR. GRADY:  No, Your Honor.

17         THE COURT:  Okay.  Well, see, the reason we do that is

18  so that you don't inconvenience other people that we scheduled

19  other matters.  And I have at least, right now, 14 other

20  objections that we haven't even touched on, and that's not

21  including other objections that have been resolved.

22         So, you know, I think at this point, you're

23  inconveniencing a lot of other people by failure to comply with

24  the local rules.  So why don't we just go ahead and continue

25  this, and you can look at these and tell us how much time you

1   need.  We will set aside a day, two days, or a week, if that's

2   necessary to resolve the other objections.

3          But I think it's unfair for the other people that have

4   been waiting to just leave them hanging, and we'll just give

5   you another time; okay?  Just tell us how much time you need,

6   we'll be happy to accommodate you.

7          I don't think your client is going anywhere, so it

8   doesn't make a difference.

9          MR. GRADY:  That's fine, Your Honor.

10         (Proceedings concluded at 11:48 a.m.)

11

12                   C E R T I F I C A T E

13

        I hereby certify that the foregoing is an
14
     accurate transcription of the proceedings in the
15
     above-entitled matter.
16
     May 19th, 2017          /s/Glenda M. Powers
17     DATE                   GLENDA M. POWERS, RPR, CRR, FPR
                              United States District Court
18                            400 North Miami Avenue, 08S33
                              Miami, Florida 33128
19

20

21

22

23

24

25